# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | |
|---|---|
| AMERICAN ALLIANCE FOR EQUAL RIGHTS, *Plaintiff*, v. PERKINS COIE LLP, *Defendant*. | Case No. |

# COMPLAINT

1. The law abhors racial discrimination. The lawyers who help administer that law are supposed to abhor it too. The ethical rules punish lawyers who "manifest by words or conduct, bias or prejudice based on race." Texas Disciplinary Rules of Professional Conduct 5.08, perma.cc/35YY-DFUW.

2. Yet Perkins Coie has been racially discriminating against future lawyers for decades. The firm's "diversity fellowships" for 1Ls and 2Ls exclude certain applicants based on their skin color. These prestigious positions are six-figure jobs that include five-figure stipends. Yet applicants do not qualify unless they are "students of color," "students who identify as LGBTQ+," or "students with disabilities." So between two heterosexual, nondisabled applicants—one black and one white—the latter cannot apply based solely on his race.

3. This kind of rank discrimination was never lawful, even before *SFFA v. Harvard* held that colleges cannot use race in admissions. Perkins is an employer making

1

hiring decisions, not a university pursuing educational benefits, and its gross racial exclusion is the kind of quota that the law has always banned. *See generally Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 722-23 (2007). As Perkins told its corporate clients just days after the decision, "Employment decisions that are overtly made on protected bases ran afoul of the law before and after [*SFFA*]." *Seven Pressing Questions Following the Supreme Court's Admissions Decision*, Perkins Coie (July 5, 2023), perma.cc/5BYJ-SNBH.

4.  But in case Perkins needed another reminder, *SFFA* reaffirms that "[e]liminating racial discrimination means eliminating all of it." 143 S. Ct. 2141, 2161 (2023). No racial discrimination is benign: It always "demeans the dignity and worth" of every American "'to be judged'" by his or her race "'instead of by his or her own merit and essential qualities.'" *Id.* at 2170.

5.  That principle is true under the Constitution, true under Title VI, and true under 42 U.S.C. §1981—the federal statute that bars private employers, like Perkins, from discriminating based on race when making contracts. Because Perkins' diversity fellowships are contracts that discriminate on their face, they violate §1981.

## PARTIES

6.  Plaintiff, American Alliance for Equal Rights, is a nationwide membership organization dedicated to challenging distinctions and preferences made on the basis of race and ethnicity. The Alliance is based in Texas.

2

7. The Alliance has members who are ready and able to apply for Perkins' 1L fellowship in 2024 (and 2L fellowship in 2025), including Member A.

8. Defendant, Perkins Coie LLP, is an international law firm. It has an office in Dallas, Texas, as well as in Austin. Its diversity "fellowships are available in the … Perkins Coie offices" in "Austin," "Dallas," and elsewhere. The Dallas and Austin offices regularly hire diversity fellows, including in 2023 and 2022.

## JURISDICTION AND VENUE

9. This Court has subject-matter jurisdiction under 28 U.S.C. §1331.

10. Venue is proper under 28 U.S.C. §1391 because Perkins resides in Dallas and a substantial part of the events or omissions giving rise to the claims occurred in Dallas.

11. Perkins has an office in Dallas, contracts to do business in Dallas, recruits fellows to its Dallas office and runs the challenged fellowships in that office, has committed the alleged tortious conduct in Dallas, and otherwise has contacts that make the exercise of personal jurisdiction in this district comport with due process.

12. Perkins' advertisements for the fellowships are published and widely circulated on the internet, including on Perkins' website, Facebook, popular job sites like LinkedIn, and law-school websites across the country. Perkins' various advertisements for the fellowships reach, and are intended by it to reach, Dallas and students interested in applying to its Dallas office. Perkins also sends instructions on how to apply to the

3

fellowships to law schools in Dallas, and to other law schools to recruit their students to its Dallas office.

# FACTS

### A. Perkins operates the 1L and 2L Diversity Fellowships, which exclude certain applicants based on race.

13. Perkins created its 1L diversity fellowship in 1991 and has run it every year since. It added the 2L diversity fellowship in 2020. "These fellowships are available in" several "Perkins Coie offices," including "Dallas." Candidates "may apply to one office only."

14. Perkins plans to operate the fellowships again in "2024," with no changes. It is "now accepting applications for [the] 2024 2L Summer Associate Program," including the 2L diversity fellowship for its Dallas office. Instructions "pertaining to the 2024 1L fellowship application timing" have been sent to law schools.

15. "The diversity fellowships are not tied to a specific practice group and may receive assignments from a variety of practices."

16. It is "common" that applicants to the 1L fellowship do not yet have any law-school grades by the application deadline. Perkins nevertheless encourages applicants to apply without grades and then "follow up" with their grades later. Decisions are made "by late January."

17. The 1L and 2L diversity fellowships are prestigious programs.

18. Students in their first year of law school are eligible to apply to the 1L fellowship, which consists of a paid summer-associate position and a $15,000 stipend. Though more common for 2Ls, paid summer-associate positions are incredibly rare for 1Ls. Summer associates are paid like entry-level associates at the firm, who at Perkins make $190,000/year. (And even for 2Ls, summer-associate positions do not normally pay an additional stipend or bonus on top of that pro-rated salary.)

19. In addition to summer employment at the firm, 1L fellows at Perkins sometimes get to "work on-site with the legal department at [Perkins'] clients' offices."

20. Students in their second year of law school are eligible to apply to the 2L fellowship, which consists of a paid summer associate position, and a $25,000 stipend, "awarded in two installments: the first [$15,000] following successful completion of the summer program and the second [$10,000] upon accepting an offer to join the firm as a full-time associate." By comparison, Perkins Coie offers a 2L summer program, which is facially open to all applicants and does not include the extra $25,000.

21. Students can apply to the 2L diversity fellowship "directly," even if Perkins does not come to their law school's "on-campus interview program."

22. The criteria are the same for the 2L diversity fellowship, except the applicant must be a "second-year law student." 2L diversity fellows are typically 1L diversity fellows who decided to "return" to Perkins for a second summer.

23. Both 1L and 2L summer associates "work on a wide range of challenging legal assignments similar to those given to new associates, including legal research, analysis and drafting." While summer associates provide work for the firm, the firm provides them with valuable training. "Supervising attorneys provide informal feedback to summer associates after each assignment, and they submit written, formal evaluations to the office hiring committee." Summer associates "are commonly invited to attend depositions, mediations, deal closings, client meetings, trials, and other professional activities and events," and "[t]hey have the opportunity for both informal and formal training." They are also "assigned mentors" who "generally guide their progress and development throughout the summer."

24. 2L summer associates are Perkins' "primary source of new associate hires."

25. Under the heading "Criteria," Perkins states that applicants cannot apply to the 1L diversity fellowship unless they meet four requirements, including the following diversity requirement: "Membership in a group historically underrepresented in the legal profession, including students of color, students who identify as LGBTQ+, and students with disabilities."

26. On a FAQs page, Perkins answers the question "What does the firm consider 'diverse'?" It reiterates that its "definition" of diversity "encompasses students of color, students who identify as LGBTQ+, and students with disabilities. If you feel that you are diverse in one or more of *these* ways, please apply." (Emphasis added).

6

27. In other words, if they are heterosexual and nondisabled, applicants are disqualified if they are white.

### B. Perkins' racial exclusions injure the Alliance's members.

28. The Alliance has members who are harmed by Perkins' racially discriminatory fellowships, including Member A.

29. Member A is ready and able to apply to Perkins' 1L diversity fellowship in 2024 and its 2L diversity fellowship in 2025, if a court orders Perkins to stop racially discriminating.

30. Member A satisfies all the criteria for the 1L fellowship, except the discriminatory one. As a white, non-disabled, heterosexual man, he does not belong to a group historically underrepresented in the legal profession.

31. Member A is a U.S. citizen.

32. Member A is a first-year student in good standing at an ABA-accredited law school. His law school is highly ranked and well-regarded, and Perkins has previously hired its graduates as associates, counsel, and partners (even a managing partner). One Perkins lawyer currently teaches at Member A's law school.

33. Member A has a demonstrated record of academic achievement, excellent writing and interpersonal skills, and experience that will contribute to a successful career in the legal field. In college, he maintained a high GPA while holding leadership positions in his fraternity and a debating society. Then, as a long-time paralegal, he worked

7

at several law firms assisting immigrants and a national nonprofit assisting religious minorities. He also did extensive writing and worked closely with clients and colleagues of all backgrounds.

34. Member A's work, experiences, and views have set him up to meaningfully contribute to the diversity efforts of his law school, and he has a strong desire to continue supporting diversity, equity, and inclusion efforts upon entering the legal profession.

35. Member A wants to apply to the fellowships because they are prestigious programs (at one of the country's best-known firms) that would provide him with great professional opportunities. Member A believes that the fellowships would provide him meaningful work experience, help him create professional connections, and connect him with professional mentors.

36. Member A is also drawn to the fellowships by the fact that Perkins will pay him tens of thousands of dollars (as a mere law student) and offer full-time employment (after he graduates). Member A would use the money he earns at the fellowship to pay living expenses and the cost of daycare for his daughter. He would also pay off student debt and avoid further debt while in school.

37. Member A's first preference—where he would apply if Perkins were ordered to stop racially discriminating—is Perkins' office in Dallas. He would like to live and work in Dallas as an entry-level attorney. He has friends who strongly endorse living

there, and he enjoys visiting Texas. He and his wife rank it as one of the top places they would like to move after he finishes law school.

38. Member A is prepared to meet the fellowships' requirements and expectations if he is accepted and joins. If a court orders Perkins to stop racially discriminating, he would assemble and promptly submit all the requested application materials, including his law-school grades once they become available.

# CLAIM FOR RELIEF

## COUNT
## Violation of the Civil Rights Act of 1866
## 42 U.S.C. §1981

39. The Alliance repeats and realleges each of its prior allegations.

40. Section 1981 states that "[a]ll persons … shall have the same right … to make and enforce contracts … and to the full and equal benefit of all laws … as is enjoyed by white citizens." 42 U.S.C. §1981(a).

41. Section 1981 applies to governmental and "nongovernmental" actors. §1981(c). The statute contains a federal cause of action "against discrimination in private employment on the basis of race." *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 459-60 (1975). It authorizes both equitable relief and damages. *Id.*

42. Section 1981 "protects the equal right of all persons … without respect to race." *Domino's Pizza, Inc v. McDonald*, 546 U.S. 470, 474 (2006) (cleaned up). Its "broad terms" bar discrimination "against, or in favor of, any race." *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 298 (1976).

43. Perkins Coie is violating §1981 by expressly excluding certain applicants from the fellowships based on race.

44. The fellowships implicate the activities enumerated under §1981, including "making … of contracts." 42 U.S.C. §1981(b). A contract "need not already exist" to trigger §1981. *Domino's Pizza*, 546 U.S. at 475. The statute "protects the would-be contractor along with those who have already made contracts." *Id.* It "offers relief when racial discrimination blocks the creation of a contractual relationship." *Id.*

45. The fellowships involve and are designed to lead to contractual relationships between Perkins and the fellows. In exchange for paid employment and a stipend, the fellows agree to work at the firm as summer associates. The fellowships are also designed to lead to future, full-time employment contracts after graduation.

46. Perkins' facial race-based discrimination is intentional. Under §1981, "a plaintiff who alleges a policy that is discriminatory *on its face* is not required to make further allegations of discriminatory intent or animus." *Juarez v. Nw. Mut. Life Ins. Co., Inc.*, 69 F. Supp. 3d 364, 370 (S.D.N.Y. 2014).

47. Perkins cannot escape liability for racial discrimination by saying that it also discriminates against applicants who are not LGBTQ+ or disabled. An employer cannot "discriminate against some employees on the basis of race … merely because he favorably treats other members" of that race. *Connecticut v. Teal*, 457 U.S. 440, 455 (1982). An employer who refuses to hire "black women," for example, is not innocent just because it's willing to hire white women and black men. *Jefferies v. Harris Cnty. Cmty.*

*Action Ass'n*, 615 F.2d 1025, 1034 (5th Cir. 1980). "So long as the plaintiff's [race] was one but-for cause" of his exclusion, "that is enough." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1739 (2020).

# PRAYER FOR RELIEF

The Alliance asks this Court to enter judgment in favor of it and against Perkins and to provide the following relief:

A. a declaration that Perkins' 1L and 2L diversity fellowships violate §1981;

B. a temporary restraining order and preliminary injunction barring Perkins from closing the fellowships' application windows, selecting fellows, enforcing the fellowships' racially discriminatory eligibility requirements, or considering race as a factor when selecting fellows;

C. a permanent injunction ordering Perkins to end the 1L and 2L diversity fellowships; barring Perkins from considering race as a factor when selecting fellows; ordering Perkins to formulate new eligibility requirements for the fellowships that are strictly race neutral; and, if necessary, ordering Perkins to redo applications and selections for the fellows in a strictly race-neutral manner;

D. nominal damages of $1;

E. reasonable costs and expenses of this action, including attorneys' fees, under 42 U.S.C. §1988 and any other applicable law; and

F. all other relief that the Alliance is entitled to.

Dated: August 22, 2023

Adam K. Mortara*
  (TN Bar No. 40089)
LAWFAIR LLC
40 Burton Hills Blvd., Ste. 200
Nashville, TN 37215
(773) 750-7154
mortara@lawfairllc.com

Respectfully submitted,

/s/ *James F. Hasson*
Cameron T. Norris*
  (TN Bar. No. 33467)
Tiffany H. Bates*
  (VA Bar No. 94166)
Steven C. Begakis**
  (VA Bar No. 95172)
James F. Hasson
  (TX Bar No. 24109982)
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
cam@consovoymccarthy.com
tiffany@consovoymccarthy.com
steven@consovoymccarthy.com
james@consovoymccarthy.com

*pro hac vice forthcoming
**member of the Northern District of Texas who resides in Fort Worth