# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | |
|---|---|
| AMERICAN ALLIANCE FOR EQUAL RIGHTS, *Plaintiff*, v. PERKINS COIE LLP, *Defendant*. | Case No. 3:23-cv-01877-L |

## PLAINTIFF'S BRIEF IN SUPPORT OF ITS
## MOTION FOR A PRELIMINARY INJUNCTION
## (RULING REQUESTED BY <u>OCTOBER 31, 2023</u>)

The law abhors racial discrimination. The lawyers who help administer that law are supposed to abhor it too. *See* Texas Disciplinary Rules of Professional Conduct 5.08. Yet Perkins Coie has been racially discriminating against future lawyers for decades. The firm's "diversity fellowships" for 1Ls and 2Ls exclude certain applicants based on skin color. These prestigious positions are six-figure jobs that include five-figure stipends. Yet applicants do not qualify unless they are "students of color," "students who identify as LGBTQ+," or "students with disabilities." So between two heterosexual, nondisabled applicants—one black and one white—the latter cannot apply based solely on his race.

This kind of rank discrimination was never lawful, even before *SFFA v. Harvard* held that colleges cannot use race in admissions. Perkins is an employer making hiring decisions, not a university pursuing educational benefits, and its gross racial exclusion is the kind of quota that the law has always banned. *See generally Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 722-23 (2007). But if any doubt remained, *SFFA* reaffirms that "[e]liminating racial discrimination means eliminating all of it." 143 S.Ct. 2141, 2161 (2023). No racial discrimination is benign: It always "demeans the dignity and worth'" of every American "'to be judged'" by his or her race "'instead of by his or her own merit and essential qualities.'" *Id.* at 2170.

1

That principle is true not just under the Constitution and Title VI, but also under 42 U.S.C. §1981—the federal statute that bars private employers, like Perkins, from discriminating based on race when making contracts. Because Perkins' diversity fellowships are contracts that discriminate on their face, they violate §1981. Plaintiff, the American Alliance of Equal Rights, has at least one member who is ready and able to apply for the program in 2024, but cannot because he is the wrong race. The Court should preliminarily enjoin Perkins from opening the application window, selecting fellows, or otherwise operating its racially discriminatory fellowship.

Time is of the essence. Perkins will start accepting applications in November 2023 and select fellows in January 2024. To prevent irreparable harm and leave time for emergency appellate relief (if necessary), the Alliance respectfully asks this Court to rule on this motion **by October 31, 2023**.

## BACKGROUND

Perkins operates the 1L and 2L Diversity Fellowships, which exclude certain applicants based on race. Perkins created its 1L fellowship in 1991 and has run it every year since. Norris Decl. Ex. A at 1. It added the 2L fellowship in 2020. Ex. A at 1. "These fellowships are available in" several "Perkins Coie offices," including "Dallas." Ex. B at 1. Candidates "may apply to one office only." Ex. B at 3.

The diversity fellowships are prestigious programs. Students in their first year of law school are eligible to apply to the 1L fellowship, which consists of a paid summer-associate position and a $15,000 stipend. Ex. B. at 1. Though more common for 2Ls, paid summer-associate positions are incredibly rare for 1Ls. In addition to summer employment at the firm, 1L fellows at Perkins sometimes get to "work on-site with the legal department at [Perkins'] clients' offices." Ex. B. at 1.

Students in their second year of law school are eligible to apply to the 2L fellowship, which consists of a paid summer associate position, and a $25,000 stipend, awarded "in two installments: the first [$15,000] following successful completion of the summer program and the second [$10,000] upon

accepting an offer to join the firm as a full-time associate." Ex. C. at 1; Ex. B at 1. By comparison, Perkins offers a 2L summer program, which is facially open to all applicants and does not include the extra $25,000. *See* Ex. E. The criteria are the same for the 2L diversity fellowship, except the applicant must be a "second-year law student." Ex. C at 1. The 2L diversity fellows are typically the 1L diversity fellows who decided to "return" to Perkins for a second summer. Ex. B. at 1.

Both 1L and 2L summer associates "work on a wide range of challenging legal assignments similar to those given to new associates, including legal research, analysis and drafting." Ex. E. at 1. While summer associates provide work for the firm, the firm provides them with valuable training. "Supervising attorneys provide informal feedback to summer associates after each assignment, and they submit written, formal evaluations to the office hiring committee." Ex. E. at 1. Summer associates "are commonly invited to attend depositions, mediations, deal closings, client meetings, trials, and other professional activities and events," and "[t]hey have the opportunity for both informal and formal training." Ex. E. at 2. They are also "assigned mentors" who "generally guide their progress and development throughout the summer." Ex. E. at 2. "The diversity fellowships are not tied to a specific practice group and may receive assignments from a variety of practices." Ex. B. at 1. And summer associates are Perkins' "primary source of new associate hires." Ex. C. at 1; Ex. D at 1.

Eligibility for the fellowships depends on an applicant's race. Under the heading "Criteria," Perkins states that applicants cannot apply to the 1L fellowship unless they meet a diversity requirement: "Membership in a group historically underrepresented in the legal profession, including students of color, students who identify as LGBTQ+, and students with disabilities." Ex. B. at 1. On a FAQs page, Perkins answers the question "What does the firm consider 'diverse'?" Ex. B. at 3. It reiterates that its "definition" of diversity "encompasses students of color, students who identify as LGBTQ+, and students with disabilities." Ex. B. at 3. "If you feel that you are diverse in one or more of *these*

3

ways, please apply." *Id.* (emphasis added). In other words, if they are heterosexual and nondisabled, applicants are disqualified if they are white.

Perkins plans to operate the fellowships again in "2024," with no changes. Ex. B. at 1; Ex. C at 1. Instructions "pertaining to the 2024 1L fellowship application timing" have been sent to law schools. Ex. B. at 1. In the past, Perkins has opened the application process for 1Ls in November. It is thus "common" that applicants do not yet have any law-school grades when they apply. Ex. B. at 3. Perkins nevertheless encourages applicants to apply without grades and then "follow up" with their grades later. Ex. B. at 3. Perkins selects fellows "by late January." Ex. B. at 3.

Plaintiff, the American Alliance for Equal Rights, is a nationwide membership organization dedicated to challenging distinctions and preferences based on race. Ex. F (Blum Decl.) ¶3. Perkins' racial exclusions injure the Alliance's members, including Member A. ¶¶4-5. Member A is ready and able to apply to Perkins' 1L diversity fellowship in 2024 (and its 2L diversity fellowship in 2025), if a court orders Perkins to stop racially discriminating. Ex. G (Member A. Decl.) ¶10.

Member A satisfies all the criteria for the 1L fellowship, except the discriminatory one. ¶¶2-6. As a white, non-disabled, heterosexual man, he does not belong to a group historically underrepresented in the legal profession. ¶2. Member A is a U.S. citizen. ¶4. Member A is a first-year student in good standing at an ABA-accredited law school. ¶3. His law school is highly ranked and well-regarded, and Perkins has previously hired its graduates. ¶3.

Member A has a demonstrated record of academic achievement, excellent writing and interpersonal skills, and experience that will contribute to a successful career in the legal field. ¶5. In college, he maintained a high GPA while holding leadership positions in his fraternity and a debating society. ¶5. Then, as a long-time paralegal, he worked at several law firms assisting immigrants and a national nonprofit assisting religious minorities. ¶5. He also did extensive writing and worked closely with clients and colleagues of all backgrounds. ¶5. Member A's work, experiences, and views have set him

4

up to meaningfully contribute to the diversity efforts of his law school, and he has a strong desire to continue supporting diversity, equity, and inclusion efforts upon entering the legal profession. ¶6.

Member A wants to apply to the fellowships because they are prestigious programs (at one of the country's best-known firms) that would provide him with great professional opportunities. ¶7. Member A believes the fellowships would provide him meaningful work experience, help him create professional connections, and connect him with professional mentors. ¶7. Member A is also drawn to the fellowships by the fact that Perkins will pay him tens of thousands of dollars (as a mere 1L) and put him on a path to full-time employment (after he graduates). ¶9. Member A would use the money he earns at the fellowship to, among other things, pay living expenses and the cost of daycare for his daughter. ¶9.

Member A's first preference—where he would apply if Perkins were ordered to stop racially discriminating—is Perkins' office in Dallas. ¶8. He would like to live and work in Dallas as an entry-level attorney. ¶8. He has friends who strongly endorse living there, and he enjoys visiting Texas. ¶8. He and his wife rank it as one of the top places they would like to move after he finishes law school. ¶8. Member A is prepared to meet the fellowships' requirements and expectations if he is accepted and joins. ¶11. If a court orders Perkins to stop racially discriminating, he would assemble and promptly submit all the requested application materials, including his law-school grades once they become available. ¶12.

## ARGUMENT

The Alliance is entitled to a preliminary injunction if it can show four factors: likely success on the merits, a substantial threat of irreparable injury, the balance of harms, and the public interest. *Louisiana v. Biden*, 55 F.4th 1017, 1022 (5th Cir. 2022). The Alliance can show all four.

## I.    Perkins' fellowships likely violate §1981.

Section 1981 states that "[a]ll persons … shall have the same right … to make and enforce contracts … and to the full and equal benefit of all laws … as is enjoyed by white citizens." 42 U.S.C. §1981(a). It "protects the equal right of all persons … without respect to race." *Domino's Pizza, Inc v. McDonald*, 546 U.S. 470, 474 (2006) (cleaned up). And its "broad terms" bar discrimination "against, or in favor of, any race." *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 295 (1976). As courts have long recognized, "Section 1981 prohibits race discrimination in the making and enforcement of contracts." *Mitchell v. Wilson*, 51 F.3d 1045 (5th Cir. 1995).

The statute applies to governmental and "nongovernmental" actors alike. §1981(c). It contains a federal cause of action "against discrimination in private employment on the basis of race." *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 459-60 (1975); *see Rathjen v. Litchfield*, 878 F.2d 836, 842 (5th Cir. 1989) (Section 1981 "'prohibits racial discrimination in the making and enforcement of private contracts.'"). And it authorizes both equitable relief and damages. *See Johnson*, 421 U.S. at 459-60.

Perkins is violating §1981 by expressly excluding certain applicants from the fellowships based on race. The fellowships implicate the activities enumerated under §1981, including "making … of contracts." §1981(b). A contract "need not already exist" to trigger §1981. *Domino's Pizza*, 546 U.S. at 476. The statute "protects the would-be contractor along with those who have already made contracts." *Id.* It "offers relief when racial discrimination blocks the creation of a contractual relationship." *Id.* The fellowships involve and are designed to lead to contractual relationships between Perkins and the fellows. In exchange for paid employment and a stipend, the fellows agree to work at the firm as summer associates. The fellowships are also designed to lead to future, full-time employment contracts after graduation.

Perkins' facial race-based discrimination is intentional. Under §1981, "a plaintiff who alleges a policy that is discriminatory on its face is not required to make further allegations of discriminatory

intent or animus." *Juarez v. Nw. Mut. Life Ins. Co., Inc.*, 69 F. Supp. 3d 364, 370 (S.D.N.Y. 2014). And Perkins cannot escape liability for racial discrimination by saying that it also discriminates against applicants who are not LGBTQ+ or disabled. An employer cannot "discriminate against some employees on the basis of race … merely because he favorably treats other members" of that race. *Connecticut v. Teal*, 457 U.S. 440, 455 (1982). An employer who refuses to hire "black women," for example, is not innocent just because it's willing to hire white women and black men. *Jefferies v. Harris Cnty. Cmty. Action Ass'n*, 615 F.2d 1025, 1034 (5th Cir. 1980). "So long as the plaintiff's [race] was one but-for cause" of his exclusion, "that is enough." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1739 (2020).

## II. The Alliance and its members will suffer irreparable harm without immediate relief.

The Alliance and its members will suffer irreparable harm absent a preliminary injunction. "The injury in cases of this kind is that a discriminatory classification prevents the plaintiff from competing on equal footing." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211 (1995) (cleaned up); *accord Parents Involved*, 551 U.S at 719 ("being forced to compete in a race-based system that may prejudice the plaintiff"). This "denial of equal treatment result[s] from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Ne. Fla Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993). It is irreparable. *See, e.g.*, *Coal. for Equity and Excellence in Md. Higher Ed. v. Md. Higher Ed. Comm'n*, 295 F. Supp. 3d 540, 557-58 (D. Md. 2017).

Moreover, the application process will quickly open and close—well before this case could reach final judgment. Instructions "pertaining to the 2024 1L fellowship application timing" have already been sent to law schools. Norris Decl. Ex. B. at 1. Fellowship awardees will be selected in just a few months—"by late January." Ex. B. at 3. Once the application period closes and fellows have been selected, Member A will have "no do over." *League of Women Voters v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016). He will have lost the opportunity to apply for or receive a fellowship in the normal course.

7

That lost opportunity, and the many intangible benefits that the fellowship provides, cannot be remedied with money damages.

### III.     The balance of the harms favors the Alliance.

The balance of harms favors the Alliance. As explained, the harm to it and its members is substantial: the harms of racial discrimination, the inability to compete on an equal footing, and the potential permanent loss of an opportunity to join a renowned fellowship. Perkins, however, faces only the potential for a slight delay in its ability to select and hire fellows. This delay will "not substantially injure" the firm. *League of Women Voters*, 868 F.3d at 12. Courts have recognized that a mere delay in a deadline imposes little, if any, harm, especially where the deadline was "arbitrarily set in the first place." *GOS Operator, LLC v. Sebellius*, 2012 WL 175056, at *5 (S.D. Ala. Jan. 20). And Perkins brought any harm upon itself by adopting a racially discriminatory program. *See Kos Pharms., Inc. v. Andryx Corp.*, 369 F.3d 700, 728 (3d Cir. 2004).

### IV.     The public interest favors the Alliance.

The public interest also weighs in the Alliance's favor. "[C]ivil rights actions vindicate a public interest." *Villano v. City of Boynton Beach*, 254 F.3d 1302, 1306 (11th Cir. 2001) (citing *Williams v. Thomas*, 692 F.2d 1032, 1038 (5th Cir.1982)). And "[i]t is in the public interest for courts to carry out the will of Congress." *Myland Pharm., Inc. v. Shalala*, 81 F. Supp. 2d 30, 45 (D.D.C. 2000). Especially where, as here, the defendant has engaged in "[r]acial discrimination," which "is invidious in all contexts." *SFFA*, 143 S. Ct. at 2166 (cleaned up).

### CONCLUSION

For all these reasons, this Court should grant the Alliance's motion for a preliminary injunction.

Dated: August 28, 2023

Adam K. Mortara**
 (TN Bar No. 40089)
LAWFAIR LLC
40 Burton Hills Blvd., Ste. 200
Nashville, TN 37215
(773) 750-7154
mortara@lawfairllc.com

Respectfully submitted,

*/s/ Cameron T. Norris*
Cameron T. Norris*
 (TN Bar. No. 33467)
Tiffany H. Bates**
 (VA Bar No. 94166)
Steven C. Begakis***
 (VA Bar No. 95172)
James F. Hasson
 (TX Bar No. 24109982)
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
cam@consovoymccarthy.com
tiffany@consovoymccarthy.com
steven@consovoymccarthy.com
james@consovoymccarthy.com

*pro hac vice
**pro hac vice forthcoming
***member of the Northern District of Texas who resides in Fort Worth

## CERTIFICATE OF COMPLIANCE

This brief conforms to the requirements of the Local Rule 7.2. It is prepared in 14 point Garamond font.

*/s/ Cameron T. Norris*

9